## BRADLEY ARLINGTON AVEY *v.* STATE OF MARYLAND

[No. 6, Initial Term, 1967.]

*Decided April 21, 1967.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ., and DYER, J., Associate Judge of the Third Judicial Circuit, specially assigned.

*Karl G. Feissner* and *Daniel Clifford Smith* for appellant.

*Franklin Goldstein, Assistant Attorney General,* with whom were *Thomas B. Finan, former Attorney General,* and *Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

On October 21, 1965, Bradley Arlington Avey was convicted on two charges of assault with intent to murder and also on a charge of breaking and entering. Subsequently, he was sentenced to twenty-four years in the Maryland Penitentiary on the three charges.

Lieutenant Thornberry, of the Prince George's County Police Department, at 2 A.M. on January 26, 1965, saw a broken window in a door of the Princeton Delicatessen in a small shopping center located near Andrews Air Force Base. He called for assistance and Officer Blandford and Officer Fyfe arrived at the scene almost immediately. Lieutenant Thorn-

berry ordered Officer Fyfe to investigate an automobile in an adjoining area, and ordered Officer Blandford to check the rear of the building while he entered the delicatessen. Lieutenant Thornberry proceeded to the rear of the store using his flashlight and noticed a door open to a dark room which was marked, "Men's Room." He also noticed another room to which the door was closed. He called for Officer Blandford to come into the store. When the officer entered, he informed him that he believed someone was in the room to which the door was closed. Both officers went to the rear of the store, turned on the lights, and noticed a figure in the men's room. Lieutenant Thornberry called to the person to come out from behind the door. Eventually Avey stepped into the lighted room and said: "Okay, Copper, let's see how good you are. Kill me." The man, who was Bradley Arlington Avey, began shooting at the officers with a .38 caliber revolver and the officers returned the fire. Both officers were hit but continued to fire at Avey and he at them.

Officer Blandford ran from the store to call for help on the radio. By this time, Officer Fyfe had returned and Officer Sellner had also arrived at the front of the building. Avey ran out of the building and Blandford called to Officer Fyfe and Sellner that Avey had a gun. Officer Blandford went to his car and called for assistance. Officers Fyfe and Sellner fired at the appellant and chased him until he was lost in the darkness. A description of Avey was put on the police radio as a white male with dark hair wearing eyeglasses, a long dark coat and a white shirt. Slightly later the description was amended to indicate that the appellant was 6'2" tall, and that the coat was a brown Army-type, three-quarter length coat. Many additional officers arrived at the scene and began a thorough search for clues and for Avey. One of the officers found a straw hat; another noticed that a motor vehicle parked near the scene of the crime was in the traveled portion of the highway. An officer looking through the window of the car saw a wallet lying on an open glove compartment door in the vehicle. He examined the wallet and found it contained an instruction examination license with the name Frank Robert Young, residence 1115 Sixtieth Avenue, Southeast, Washington, D. C., and a

description of a 5'11", 165 pound white male. Date of birth, August 1, 1938. The officer, Detective Cissel, noted that the description fitted roughly the description of Avey given at the scene and noticed that the address was the home of a Bonnie Caldwell, a woman with whom he was acquainted. Detective Cissel went to that address and met a woman by the name of Patricia Hart who admitted him into the house where he stayed for approximately 45 minutes. While he was there, at 7:10 A.M. the telephone rang and Mrs. Hart held the telephone in such a manner that Detective Cissel could hear the conversation as well as she. After listening to the conversation, he radioed headquarters and suggested that officers proceed to the Texaco Station at Andrews Air Force Base, which was close to the scene of the crime.

Staff Sergeant, Francis P. Lynch, of the Air Police at Andrews Air Force Base, was dispatched to the Texaco Station and arrived at approximately 7:15 A.M. on January 26, 1965. He waited approximately two minutes for Officer Ritter of the Prince George's County Police Department to arrive at the scene. Sergeant Lynch and Officer Ritter approached Avey. Officer Ritter noticed that he generally fitted the description that he had previously received of the man who had been involved in the shooting. That description was a man approximately 5'11", 160 to 165 pounds, who possibly had a mustache and was dressed either in a gray or tan-colored coat. Sergeant Lynch asked the appellant his name and received the reply, "Frank Brady." When he was asked for identification he stated that he had none. He was then asked about scratches and lacerations on his right hand, and he explained he had received them while working on his car, but Officer Ritter noted that there was no grease or oil or dirt on the back of his right hand. Sergeant Lynch questioned him as to what purpose he had to be on the Air Force Base and he replied he came to call for someone to fix his car. Sergeant Lynch requested the appellant to accompany him to the Air Police Operations Office in order to find out exactly why he was on the Base and the appellant agreed to go.

Avey got into the Air Police Vehicle in the company of

Sergeant Lynch and two other officers who arrived at the scene at that moment, Detective James Ross and Officer Robert Meyers of the Prince George's County Police Department. The officers testified that Avey was not searched nor handcuffed. Avey said he was handcuffed. At the Air Police Operations Office Detective Ross began to question Avey after advising him of his right to remain silent, to call an attorney, and he did not have to answer any questions and that anything he said could be used against him. He also advised him that he wished to question him concerning the shooting of two police officers at the shopping center. At this moment, Detective Ross observed a hole in the glove on Avey's left hand and he examined underneath the glove and found a puncture type injury to the left hand. Detective Ross then asked Avey if he would rather wait until he had his injuries taken care of before talking about the incident, and Avey said he would rather wait. Detective Ross and officers Meyers and Baeschlin, who arrived later, took Mr. Avey to the Prince George's General Hospital in Cheverly and arrived at approximately 8:10 A.M. After the appellant was examined and x-rayed at the hospital, he was fingerprinted and photographed with his consent. He also voluntarily removed his clothing in the presence of the officers who took custody of the clothes. It appeared that he had two bullet wounds.

Officers Sellner and Fyfe came to the emergency room and identified Avey as the man they had shot at running from the Princeton Delicatessen. Thereafter, Detective Ross questioned the appellant and he admitted that he had broken into the delicatessen and that he had shot at the two officers. The trial court found as a fact that contrary to Avey's testimony, he at no time asked for a lawyer or to make a telephone call or made any other request that was denied. He further found that the confession was made without any threats or promises.

Sergeant Frank Thompson of the Prince George's County Police Department arrived at the hospital prior to 11 A.M. with a straw hat that had been found near the scene of the crime. Avey admitted it was his hat. Sergeant Thompson then asked Avey why he shot the two officers, and he replied "because I was drunk." He then asked him where the weapon

was located and he told him that he put it under the right front seat of either a Ford or Mercury station wagon near the scene. The trial court found that these statements were also made without threats or promises. The gun was recovered under the right front seat of a Ford station wagon parked near the scene. Following the admissions, arrest warrants were served.

Sometime thereafter Avey became mute. He was admitted to The Clifton T. Perkins State Hospital on February 12, 1965, and continued his muteness until July 19, 1965. John M. Hamilton, M.D., Superintendent of The Clifton T. Perkins State Hospital, in May, made a tentative diagnosis that Avey was insane at the time of the crime and insane then. In his notes, however, he made mention of the fact that Avey may have been malingering. Subsequent to July 19, 1965, certain tests were made and Dr. Hamilton determined that Avey was sane at the time of the trial and was sane at the time of the crime. A psychiatrist testifying for the defense stated that in his opinion Avey was sane at the time of the trial but was insane at the time the crime was committed. The trial judge, and subsequently the jury, accepted the testimony of Dr. Hamilton.

## I

The first question raised by the appellant is the legality of the arrest. The trial court found that the arrest did not occur until after Avey had voluntarily gone to the Air Police Operations Office and voluntarily gone to the Prince George's County Hospital for treatment. There is ample evidence to support the finding. After the bullet wounds were observed, no one could contend that the officers lacked reasonable grounds to believe a felony had been committed and that Avey was the felon. We hold that after Detective Ross observed the hole in the left glove and remembered that Avey had held his hand between his knees enroute to the Air Police Operations Office, there was ample grounds for an arrest at any time thereafter, if not before, *McChan v. State,* 238 Md. 149, 207 A. 2d 632; *Hewitt v. State,* 242 Md. 111, 218 A. 2d 19.

## II

Avey contends that the trial court was in error when it re-

fused to suppress evidence obtained as a result of an arrest made from information gleaned from an illegal interception of a telephone call. The short answer to this contention is that, assuming the interception by Detective Cissel was unlawful, the arrest was in no way invalidated. In the case of *Leek v. State*, 353 F. 2d 526 (4th Cir., 1965) it was held that an arrest directly resulting from an illegal search of the home did not in any way invalidate the arrest. The result of the telephone conversation was that Avey was arrested sooner than he may have been otherwise. The telephone conversation was not introduced into evidence.

### III

Avey contends that the trial court erred in refusing his motion to appoint a special investigator to aid the accused in preparation of his defense. He cites several cases holding that the accused is entitled to assistance of counsel, but he cites none to show that the court is required to appoint a special investigator to assist the counsel. In denying the motion, the trial judge stated that he would appoint additional counsel if needed, and would appoint such other experts as might be needed from time to time. The appointment of an investigator is a matter within the sound discretion of the trial court and no abuse of that discretion has been shown in this case. We find that the record shows beyond any reasonable doubt that the defendant was afforded a defense by a lawyer who was thoroughly familiar with the facts and that counsel left no stone unturned in raising every possible issue at the trial as well as here.

### IV

Avey made a motion for the appointment of two law professors to advise the jury as to the law of the case insofar as it concerned constitutional and criminal law. The motion was based upon the fact that under Maryland Law the jury is the judge of the law and the facts. He does not state why the opinion of the law professors could be expected to be superior to the advisory instructions given by the trial court. Suffice it to say that the Court of Appeals of Maryland has upheld Article 15 Section 5 of the Constitution of Maryland as not in

conflict with the Constitution of the United States, in the case of *Giles v. Maryland,* 229 Md. 370, 183 A. 2d 359, appeal dism. 372 U. S. 767, 83 S. Ct. 1102, 10 L. Ed. 2d 137.

## V

The next question Avey presents is the voluntariness of the confession. At the outset it should be noted that the case was tried prior to the decision in *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L Ed. 2d 694 (June 13, 1966). *Johnson v. New Jersey,* 384 U. S. 719, 86 S. Ct. 1772, 16 L. Ed. 2d 882 held that *Miranda* was not applicable to cases tried prior to its date and *Meadows v. Warden,* 243 Md. 710 held that Maryland would not apply a different rule as to retroactivity. The confession was found by the trial court to be voluntary and not obtained by reason of threats or promises. Avey alleges that his request for counsel was refused and that he was denied medical assistance for his wounds until he made a statement. The trial court found contrary to these contentions. Its findings are well supported by the record.

## VI

Avey next contests the chain of custody proffered to support the admission of his clothing in evidence. The trial court found the chain of custody had been established and there is ample evidence to support its decision. The Court of Appeals of Maryland in the case of *Breeding v. State,* 220 Md. 193 at page 199, 151 A. 2d 743 stated: "The question is one of reasonable probability that no tampering occurred." The police officers here testified that the clothing appeared to be identical to that removed by Avey. Under the circumstances here we hold that this testimony is sufficient to make the clothes admissible.

## VII

Avey alleges that the trial court should have directed a verdict of not guilty by reason of insanity. Dr. John M. Hamilton, Superintendent of The Clifton T. Perkins State Hospital, testified that Avey was sane at the time of the crime. This testimony was sufficient for the trial court to refuse the request for a directed verdict. The court could not direct a verdict if

there is any credible evidence to the contrary, *Daniels v. State,* 213 Md. 90 at page 109, 131 A. 2d 267.

## VIII

Avey contends that the following language used by the State's Attorney in the course of his argument to the jury, constituted reversible error: "This man is a modern miracle. He goes insane just at the time of the commission of the crime. The minute it is over he becomes sane again to go out and commit additional crimes." On motion for mistrial, the trial judge stated that he was denying the motion for the reason that he had previously instructed the jury that it was improper for them to consider the result of their possible verdict of not guilty by reason of insanity. In addition, both attorneys, in their arguments to the jury, stated that argument was not evidence.

In *Cook v. State,* 225 Md. 603, 610, 171 A. 2d 460, cert. den. 368 U. S. 970, 82 S. Ct. 445, 7 L. Ed. 2d 398, the Court of Appeals of Maryland said: "This court has stated that the trial court is in an advantageous position to judge the question of prejudice and its decision with reference thereto should not be reversed unless it is clear that there was prejudice." In that case the Court of Appeals ruled that the instruction of the court was sufficient to correct a statement of the State's Attorney, that the accused had been convicted of other crimes when there had been no such evidence introduced at the trial. We hold that the argument here was no more prejudicial than the statement in the case of *Cook v. State,* supra, and that the error here, if any, was corrected by the instruction given by the trial court.

## IX

Avey objects to the charge to the jury on two counts: (1) Because the court refused to instruct the jury of the fact that the appellant had been drinking may have some effect as to whether he could form the specific intent to commit the crimes and (2) The definition of reasonable doubt.

As to part No. 1 the court included in its charge the following statement:

"Now, as to the assault with intent to murder and with the intent to maim, I instruct you in an advisory capacity that you

may properly consider the state of mind of the defendant at the time of the shooting. I say that because of the type of evidence that has been introduced in this case."

The majority rule is that where intoxication exists to a degree that it deprives the accused of his capacity to form a specific intent, he cannot be convicted of a crime requiring that intent, e.g. assault with intent to kill or maim, 22 C.J.S. Criminal Law Section 68. Compare *Clarke v. State,* 236 Md. 648, 207 A. 2d 94, *Lipscomb v. State,* 223 Md. 599, 165 A. 2d 918. We consider the court's instruction, however, adequate under the majority rule.

As to part No. 2, after instructing the jury that the state must prove the commission of the crimes beyond a reasonable doubt to a moral certainty, the judge said:

"The words 'to a moral certainty' do not mean absolute or a mathematical certainty, but a certainty based upon convincing grounds of probability. The phrase 'beyond a reasonable doubt' does not mean beyond any doubt or all possible doubt, but, as the words indicate, beyond a doubt that is reasonable, that is, a doubt that is based upon reason. As an example of that I will give you our old law school definition of reasonable doubt, handed down from generation to generation of lawyers to students, and then as those students grow up to be lawyers down to the next generation, and that is a reasonable doubt is that doubt that is based upon reason, and an example of that, in dealing with the more important events of your life, such as getting married, buying a home, christening a child, joining a church, giving birth to a child, these are vital, important steps in your lives, if during the consummation of any one of these events something would cause you to pause or hesitate before you went forward to consummate this important decision in your life, then that would be a reasonable doubt."

Except for the specific references as to what constituted important affairs of life, the charge was approved by the Court of Appeals of Maryland in the case of *Lambert v. State,* 193 Md. 551, 69 A. 2d 461. The examples given by the trial judge are among the most important affairs of life. We see no error in the instructions.

190

Avey's specific complaint concerns that portion of the charge which states that "a reasonable doubt is a doubt based upon reason." This is a mere reversal of the words and does not change their meaning.

*Judgment affirmed.*