LOUIS EDWARD SWANSON *v.* STATE
OF MARYLAND

[No. 483, September Term, 1969.]

*Decided June 30, 1970.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Morris Lee Kaplan* for appellant.

*T. Joseph Touhey, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *James B. Dudley, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

Charged with the crime of rape in the Criminal Court of Baltimore, appellant filed a written plea of insanity at the time of the commission of the offense. Pursuant to Maryland Code, Article 59, Section 9(b), he was referred to the Department of Mental Hygiene and more particularly to the Clifton Perkins State Hospital for evaluation as to his sanity.[1] The Department's report indicated that it was the unanimous opinion of the psychiatric staff which examined appellant that he was sane at the time the crime was committed and was competent to stand trial. Appellant, an indigent, then filed a petition to employ a private psychiatrist at State expense so that he could obtain an independent opinion as to his sanity. Underlying the petition was the claim that due process of law under the Fourteenth Amendment required that it be granted. The State opposed the petition and an eviden-

---

1. The statute provides that the court in which the insanity plea is filed "shall have full power and authority to order an examination of the mental condition of such person by the Department of Mental Hygiene * * *." Section 10 requires the Department to forward its report evaluating the subject's sanity to the court having jurisdiction within sixty days after referral. The purpose of these provisions is paternalistic in nature, *viz.,* to protect an offender who is mentally incapable of forming a criminal intent from being punished as if he were sane. *Hamilton v. State,* 225 Md. 302.

tiary hearing was held, at the conclusion of which the hearing judge, Thomas J. Kenney, filed an extensive opinion denying appellant's petition.

At the trial before a jury, appellant renewed his motion to employ a private psychiatrist at State expense. It was denied by the trial judge for the reasons set forth in Judge Kenney's opinion. There being no evidence adduced by appellant to rebut the presumption of sanity, the trial judge declined to permit the issue to go to the jury. *See Strawderman v. State,* 4 Md. App. 689. At the conclusion of the trial, appellant was found guilty of rape and sentenced to life imprisonment. He contends on appeal, as he did below, that due process of law requires that he not be bound by the report of the State hospital; that as affluent defendants pleading insanity are permitted to be examined by private psychiatrists, to deny that privilege to an indigent defendant solely on account of his poverty is violative of the Fourteenth Amendment; that even granting the professional competence and integrity of the hospital staff, the hospital is nevertheless "operated by the State, paid for by the State, and the obligations of its staff and members are to the State and not to the defendant"; and that, as an indigent, he has the constitutional right to retain at least one psychiatrist for an independent opinion.

In his opinion denying appellant's petition, Judge Kenney noted that the report of the hospital was unanimous in its conclusion that appellant was sane (then and now). Judge Kenney stated: "The Court has been referred to no statute and knows of none that gives an indigent defendant an absolute right to have a private psychiatrist appointed to assist him at State expense in his effort to establish a defense of insanity. Due process, of course, requires that an indigent defendant, desiring to assert the defense of insanity or his competency to stand trial, have the right to be examined by an impartial, competent psychiatrist at State expense.

"Dr. John M. Hamilton, Superintendent of The Clifton T. Perkins State Hospital, testified at the hearing that

this hospital is a part of the State of Maryland Department of Mental Hygiene and makes the examinations, studies and reports of persons referred to the Department of Mental Hygiene by Judges of the Criminal Courts throughout the State of Maryland, pursuant to Article 59 of the Annotated Code of Maryland. The Hospital facility is located at Jessup, Maryland, and has 246 beds. The average number of patients in attendance is 189, which, according to the doctor, results in the staff being able to function at a very high level of efficiency. The Hospital has 292 employees, and an operating budget of nearly $2,000,000 a year. The staff includes eleven psychiatrists, including Dr. Hamilton, four psychologists, seven social workers, twelve rehabilitation workers, and nursing personnel number 114. Presumably remaining personnel are engaged in administrative, maintenance and housekeeping activities.

"The Hospital procedure requires that a psychiatrist and a social worker see the court-referred patient on the day of his admission. Within a week, the Clinical Director assigns a psychiatrist to direct the team who will collect information, perform tests, and study and report on the patient. This team consists of a psychiatrist, a psychologist, a social caseworker, and the nursing personnel, who make observations and reports. According to Dr. Hamilton, an electroencephalogram is performed in every case. After the pertinent information concerning the history and the background of the patient is assembled, the necessary medical and psychiatric tests administered, the case is presented at a staff meeting, usually between forty-five and fifty-five days after the patient's admission. A minimum of five psychiatrists must attend such a staff meeting, and Dr. Hamilton advises that an average attendance of psychiatrists is seven. He also points out that the psychiatric staff contains doctors representing the principal schools of psychiatric theory. In addition to the psychiatrists, a psychologist, social worker, and a representative of the nursing staff are present to report on the patient with the psychiatrist in charge of the case. The

patient is later brought into the meeting so that the people present may observe him and ask questions in areas in which they are interested.

"The report then prepared and sent to the Court, with copies to the State's Attorney and defense counsel, indicates clearly if the opinion expressed by the staff with respect to competency and legal responsibility was unanimous or not. If the opinions of the psychiatrists were not unanimous, the number of psychiatrists on each side of the question is stated.

\* \* \*

"Dr. Hamilton testified that since he has been associated with the Hospital, beginning in 1960, he estimates that the staff is unanimous in its opinions in 60% to 65% of the criminal cases referred. He also testified that from July 1, 1962, up to the present time, 1,196 persons have been referred to the Perkins Hospital in criminal cases. Of this number, 130 persons were found incompetent to stand trial and not criminally responsible for their alleged crimes. In addition, five or six were found to be incompetent to stand trial but legally responsible at the time of the commission of the alleged offenses. According to Dr. Hamilton, of the 1,196 persons referred to Perkins Hospital in criminal cases, there has not been a single instance where a trial judge or jury reached a different result in cases where the Perkins staff opinion was unanimous that the defendant was legally responsible or competent to stand trial. Indeed, according to Dr. Hamilton, in cases where the Perkins staff reported the defendant to be legally responsible but the Perkins staff was not unanimous, there have only been three cases out of all those referred where the judge or jury found the person not to be legally responsible.

"Dr. Hamilton also testified that if the defendant authorizes the Hospital to make its files and records available to the defendant's attorney, that the Hospital is very happy to comply with the authorization; and further, that the personnel at the Hospital are available to the defendant's attorney for consultation concerning the examina-

tion and records and are glad to explain anything that the attorney thinks requires further elucidation. It might be noted here that absent authority from the defendant, the State's Attorney has no right to inspect the records and files of Perkins.

"Counsel for * * * [appellant] argues that since * * * [he is] indigent, * * * [he] should not be penalized because of * * * [his] poverty and should have available for * * * [his] defense any help available to a person who is not indigent. Whether the present status of the law requires acceptance of any statement that broad need not concern us now, but certainly due process requires that a defendant who cares to assert the defense of insanity or questions his competency to stand trial has the right to be examined by impartial, competent psychiatrists, and it is the duty of the State to supply the defendant with such an examination.

"The State's Attorney argues that due process has been complied with when an indigent defendant is sent to the Perkins Hospital. According to Dr. Hamilton, he is not aware of any private psychiatrist who has the staff and facilities to examine and report on a patient that Perkins has. Indeed, he expressed doubt that a private psychiatrist, who may interview and observe the patient for one to three or four hours but lacks completely the opportunity to observe him for weeks in an institution in everyday living, can really give a worthwhile opinion. It could well be argued that an indigent defendant in the State of Maryland is actually receiving psychiatric study and evaluation far beyond the means of most non-indigent criminal defendants to obtain for themselves, and perhaps as good as, if not better than, the quality of psychiatric examination our most wealthy citizens could afford if indicted.

"If there was less than unanimity in the opinion of the staff at Perkins concerning the mental responsibility and competency of * * * [appellant] the Court would give serious consideration to authorizing additional psychiatric examination and opinion concerning the * * * [ap-

pellant]. But here, where there is unanimity of opinion from an impartial and qualified staff of a psychiatric hospital maintained for this purpose at great expense to the taxpayers, the Court is unable to see why it should further spend taxpayers' money to enable a defendant to shop around in the hope that he can find some psychiatrist who is willing to come to Court and testify that the defendant is incompetent and was not legally responsible at the time of the commission of the alleged offense. One wonders if such an order were passed and the first private psychiatrist consulted, after examination and study of the defendant, were of the same opinion as the Perkins staff, if the Court would not be requested to authorize a second, third or fourth doctor to be employed until one was found who would be willing to testify in Court that the defendant was not competent or legally sane.

\* \* \*

"In view of the unanimous opinion of the Perkins staff, and absent any showing in these cases for any particular need of an additional psychiatric examination, the Petitions or Motions in the three cases are denied."

On the facts of this case, we think Judge Kenney's reasons for denying appellant's petition were sound and we adopt his views. The cases clearly support Judge Kenney's conclusion. In *McGarty v. O'Brien,* 188 F. 2d 151 (1st Cir.), the indigent petitioner, convicted of murder, sought to employ independent psychiatrists to examine him, the report of the State-employed psychiatrists to whom he was referred by the court for a mental examination having concluded that he was legally sane. There, as here, it was claimed that it was the right of the indigent accused under the Fourteenth Amendment to have such psychiatric assistance at State expense. The court disagreed, stating:

" \* \* \* Obviously enough, an indigent defendant with assigned counsel may be at a disadvantage as compared with a wealthy defendant having unlimited means for the hiring of investigators,

of various sorts of expert witnesses, of a battery of lawyers. It is indeed not only the wholly indigent defendant who is subject to this disadvantage, but also accused persons of small means who still have money enough to employ counsel of their own choice. Such disadvantage, of course, is not imposed by the state, but results from the financial situation in which the accused finds himself. How far the state, having the obligation to afford to the accused a fair trial, a fair opportunity to make his defense, is required under the due process clause to minimize this disadvantage is a matter which, in other contexts, may deserve serious examination.

"The issue presented for decision in the present case is a much narrower one. This is not a case where the state has refused to provide an impartial psychiatric examination of the accused with a view to determining his sanity and criminal responsibility. Quite the contrary, in compliance with a mandatory provision of law, the state has, at public expense, provided such examination by two impartial experts; and their joint report has been made available to the defense. The doctors designated by the Department of Mental Health to make the examination are not partisans of the prosecution, though their fee is paid by the state, any more than is assigned counsel for the defense beholden to the prosecution merely because he is, as here, compensated by the state. Each is given a purely professional job to do—counsel to represent the defendant to the best of his ability, the designated psychiatrists impartially to examine into and report upon the mental condition of the accused."

The court in *McGarty* concluded that the State has no constitutional obligation to promote a battle between psychi-

atric experts "by supplying defense counsel with funds wherewith to hunt around for other experts who may be willing, as witnesses for the defense, to offer the opinion that the accused is criminally insane * * * [at least] where there has been no challenge of the professional standing and competence of the psychiatrists whose examination and report has been furnished at State expense, and no question has been raised as to their complete impartiality or as to the thoroughness of their examination of the accused." At page 157.

*McGarty* was cited as controlling authority on a similar question raised in *Proctor v. Harris,* 413 F. 2d 383 (App. D.C.), opinion by Burger, J. (now Chief Justice of the Supreme Court). To the same effect, see *Watson v. Patterson,* 358 F. 2d 297 (10th Cir.) ; *United States v. Baldi,* 192 F. 2d 540 (3rd Cir.), affirmed 344 U.S. 561; *United States v. Anderson,* 304 F. Supp. 545; *Commonwealth v. Medeiros,* 236 N.E.2d 642 (Mass.) ; *State v. Crose,* 357 P. 2d 136 (Ariz.) ; *People v. Carpenter,* 150 N.E.2d 100 (Ill.) ; *Phillips v. State,* 197 So. 2d 241 (Miss.) ; *Commonwealth v. Phelan,* 234 A. 2d 540 (Pa.). *See also Avey v. State,* 1 Md. App. 178.

Appellant also contends that there was no evidence legally sufficient to justify the court's denial of his motion for a judgment of acquittal. We disagree. The victim testified that appellant, whom she identified in court, followed her into the building where she was employed and into the ladies' rest room therein where he placed his hand over her mouth, told her he had a knife, and threatened to kill her if she screamed. She testified that appellant forced her into a closed toilet stall, compelled her to disrobe, made her sit on the toilet bowl, and then raped her from a kneeling position. There was evidence showing that during the attack, Virginia Sellner entered the restroom, observed the victim's clothing piled on the floor, and waited outside where she subsequently observed appellant, who she identified in court, emerge from the restroom. When he encountered Mrs. Sellner, he stated he was "in the wrong place." Appellant was intercepted by build-

ing officials as he attempted to leave; he told them he was in the building visiting his cousin. There was evidence showing that the garments of both the victim and the appellant contained male sperm. There was evidence showing that the victim had recently engaged in sexual intercourse.

Appellant, in his testimony, claimed he was in the building seeking work and that he was mistakenly identified. He denied seeing or assaulting the victim.

On this evidence, including the testimony of the victim that she was in fear of her life when she submitted to the intercourse, we think the case was properly submitted to the jury. *See Walter v. State*, 9 Md. App. 385.

*Judgment affirmed.*