## RALPH EDWARD WILKINS *v.* STATE OF MARYLAND

[No. 124, September Term, 1972.]

*Decided January 11, 1973.*

The cause was submitted on briefs to MOYLAN, GIL-BERT, SCANLAN and DAVIDSON, JJ.

Submitted by *Karl G. Feissner* and *Feissner, Kaplan, Smith & Joseph* for appellant.

Submitted by *Francis B. Burch, Attorney General, James L. Bundy, Assistant Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County, E. Garrison Neal* and *Eugene Muskus, Assistant State's Attorneys for Prince George's County,* for appellee.

SCANLAN, J., delivered the opinion of the Court.

The appellant, Ralph Edward Wilkins, was convicted by a jury in the Circuit Court for Prince George's County of murder in the first degree. The presiding judge (Bowie, J.) sentenced him to life imprisonment. He has appealed from the judgment of conviction and the sentence imposed.

Eyewitnesses placed the appellant at the scene of the murder. Appellant also admitted being at the scene of the crime, but claimed another person had "done the shooting." He entered pleas of not guilty and not guilty by reason of insanity. The appellant did not take the stand in his own defense. The defense offered no witness with respect to the murder charge against him. Nor was there any testimony adduced to the effect that he was criminally insane at the time of the crime. In denying appellant's motion for a new trial, the trial court stated "that it is very seldom that the State has a case where they nail the case down more clearly than they did in this case."

On his appeal, the appellant has not challenged the sufficiency of the evidence. However, he has raised a plethora of other contentions in his attack on the judgment below. Several of these raise issues of constitutional dimension; one of them presents issues of first impression in this Court; a few are troublesome; but none rise to the level of an argument sufficient to require reversal of the judgment of conviction. In the ensuing sections of the Court's opinion, we discuss appellant's contentions *seriatim* in the order in which they were presented in his brief.

## I

### THE CHALLENGE TO THE ARRAY WAS PROPERLY DENIED

Prior to trial, appellant moved to challenge the jury array contending that the exclusive use of the 1970 list of Prince George's County registered voters for the selection of jurors denied appellant due process of law and the right to be tried by a "jury of his peers." Appellant also attacked the constitutionality of Article 51, § 6 (b) (viii) of the Code (1972 Repl. Vol.), which bars persons "21 years of age or under" from jury service. For the reasons stated, we hold that the court below properly denied appellant's motion challenging the array.

In 1969, Maryland adopted a uniform and comprehensive statute governing the selection of jurors throughout the political subdivisions of the State.[1] The policy which underlies the statute is set forth in its first section which reads as follows:

> "Whenever a litigant . . . is entitled to trial by jury, he shall have the right to a petit jury selected at random from a fair cross section of the citizens of this State resident in the county

---

1. Chap. 408, Acts 1969, now found as Article 51 of the Annotated Code of Maryland (1972 Repl. Vol.).

wherein the court convenes . . . Whenever a
person is accused of an indictable criminal of-
fense . . . , he shall have the right to a grand
jury selected at random from a fair cross sec-
tion of the citizens of this State resident in the
county wherein the court convenes . . . All citi-
zens of this State (1) shall have the opportu-
nity to be considered for service on grand and
petit juries in the courts of this State by main-
taining their names on the roll of registered
voters for State elections, . . ." (Art. 51, § 1)

The statute also provides that:

"No citizen shall be excluded from service
as a grand or petit juror of this State on ac-
count of race, color, religion, sex, national origin
or economic status." [2]

Section 4 of the jury statute requires a written plan
for random selection of jurors which will achieve the
objectives of the statute and comply with its detailed
provisions. In accordance with the statute, the court
used the 1970 list of registered voters to select the jury.
Appellant contends that this list did not represent "a
fair cross section of the community," because 43%, or
165,812, of the population of Prince George's County
who were over 21 years of age failed to register for the
election held that year and thus could not qualify as
jurors. The point thus raised is one of first impression
in this Court, although it has been ruled upon else-
where.[3]

Article 51, § 1 incorporates the constitutional require-
ment that a defendant "is entitled to trial by (a) jury
. . . selected . . . from a fair cross section" of the com-
munity in which he is being tried. *Smith v. Texas*, 311
U. S. 128, 130 (1940). It is not necessary, of course,
that the jury actually selected be representative of the

2. Article 51, § 2.
3. United States v. Van Allen, 208 F. Supp. 331 (S.D.N.Y. 1962);
United States v. Greenberg, 200 F. Supp. 382 (S.D.N.Y. 1962).

community. *Thiel v. Southern Pacific Co.*, 328 U. S. 217, 220 (1946). However, it is a constitutional mandate that "the source of names of prospective jurors and the selection process be reasonably designed to procure a fair cross section." *United States v. Guzman*, 337 F. Supp. 140, 143 (S.D.N.Y. 1972), *aff'd*, 12 Cr. L. 2212 (2d Cir. 1972) ; *United States v. Van Allen*, 208 F. Supp. 331, 334 (S.D.N.Y. 1962). The Supreme Court has summarized the basic constitutional prerequisite to be observed in jury selection:

> "The American tradition of trial by jury, . . . necessarily contemplates an impartial jury drawn from a ˉcross-section of the community. *Smith v. Texas*, 311 U. S. 128, 130; *Glasser v. United States*, 315 U. S. 60, 85. This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury." *Thiel v. Southern Pacific Co., supra* at 220.

Thus, the crux of the inquiry raised by the appellant's challenge to the array is whether use of the voter registration list produced a "systematic and intentional exclusion of any cognizable group or class of qualified citizens." *United States v. Guzman, supra* at 143. The stat-

ute (Art. 51, § 2) identifies six classes or groups who cannot be discriminated against in the jury selection process. However, the appellant would go further. He maintains that otherwise qualified voters who failed to register to vote constitute a definite group or class who have been unlawfully excluded from service as jurors.

The State argues, with considerable persuasion, that the constitutionality of using registered voters lists has been approved, impliedly at least, by the Supreme Court. In *Brown v. Allen,* 344 U. S. 443, 474 (1953), the Court approved the use of property tax lists. Voter registration lists are more encompassing than property tax lists. The less affluent, members of racial and ethnic minorities, and young people appear in proportionately greater numbers on a voters' list. In addition, the Supreme Court's decision in *Brown v. Allen, supra,* arose in a context of racial discrimination, an area where the Court has been especially vigilant in protecting against discriminatory stratagems designed to exclude Negroes from jury duty. *Smith v. Texas, supra; Patton v. Mississippi,* 332 U. S. 463 (1947). We could, therefore, base our holding in this case on the precedent furnished by the *Brown* decision. However, the precise issue raised by the appellant is a novel one and not passed upon in the *Brown* case. Accordingly, we move beyond the limited light shed by *Brown* to deal directly with the precise but different factual issue presented by the appellant's challenge to the array in this case. That question is: Were the otherwise eligible voters of Prince George's County who failed to register for the 1970 election a cognizable or identifiable group or class for purposes of jury selection? If they constitute such a definitive class, use of the 1970 registered voters list systematically, if not intentionally, excluded the class from jury service. If the nonregistered voters were not a "cognizable" class, then their exclusion from jury service offended no constitutional or statutory right possessed by the appellant.

For a group to be "cognizable", the group must have a definite composition. As Judge Metzner recently spelled it out:

> ". . . That is, there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace."
> *United States v. Guzman, supra* at 143-4.

The appellant produced the census statistics as to the total population of Prince George's County in 1970 and compared these figures with the number of registered voters. However, he made no effort to demonstrate that persons, otherwise qualified, who failed to register for the 1970 election constituted a group or class of persons who showed a basic similarity "in attitudes, ideas or experience" which could not have been adequately represented in view of the exclusion of the class from the jury selection process and that the exclusion of the class resulted in partiality or bias on the part of the juries which were selected through exclusive use of the 1970 registered voters list.

In the absence of proof, the appellant, in effect, is asking that the Court declare that, as a matter of law, non-registered voters constitute a cognizable group of persons in the community. This would be an abuse of our appellate functions. Moreover, in two cases where the precise issue has been decided and in which the parties challenging the array produced economic, racial,

sociological, demagogical and educational statistics, findings and analysis in attempting to establish the cognizable nature of the group of nonregistrants, the courts held that non-registered voters did not represent a cognizable group and that the use of voter registration lists was a permissible method of jury selection. Thus, in *United States v. Greenberg, supra* at 391, Judge Bryan said:

> "He characterizes this group as 'the politically dormant' and says that their common failure to vote is a cohesive factor which binds all of them together in a community of interest. There is no merit to this contention. . . . *All that such persons have in common is their failure to exercise the right of franchise at a given election. They are united only in disinterest.*" (emphasis added).

*Greenberg* was followed by *United States v. Van Allen, supra* at 335-6, where Judge Cashin stated:

> "It cannot be said that non-registrants represent a certain or cognizable group of persons. Non-registrants vary from election to election. . . . It is undisputed that in New York registration is available to all qualified persons, with strict legal prohibition against discrimination based upon race, sex, religion, national origin, or wealth. Thus, the use of registration lists to select jurors actually guarantees the presence of these groups on the jury list."

We find that both the rationale and the rulings in the *Greenberg* and *Van Allen* decisions persuasive. Neither the Constitution, nor the requirements of common sense, demand a scientifically perfect system for producing a representative cross section of the community. Nor has such a system been devised. Meanwhile, arguments "can be made against the use of any lists, as none are available for the whole population." *United States v. Local 36*

of *International Fishermen*, 70 F. Supp. 782, 799 (S.D. Cal. 1947), *aff'd*, 177 F. 2d 320 (9th Cir. 1949), *cert. denied*, 339 U. S. 947 (1950). Under existing realities, as Mr. Justice Holmes once put it in another context: "There must be a limit to . . . such matters if government is to go on." *Bi-Metallic Investment Co. v. State Board of Equalization of Colorado*, 239 U. S. 441, 445 (1915). All that is required is a method reasonably designed to produce a jury representative of a cross section of the community. The objective selection of names at random from registration lists as provided for by Article 51 "fully satisfies this requirement and commends itself to an impartial jury system." *United States v. Greenberg, supra* at 391.

Appellant also complained in his motion challenging the array that persons between the ages of 18 and 21 were excluded by virtue of Article 51, § 6 (b) (viii). Although his appeal claims error generally on the part of the court below in overruling his motion to challenge the array, appellant's brief in this Court does not argue the issue of excluding those between 18 and 21 from jury service. Accordingly, we would be entitled to treat that issue as abandoned in this Court. Rule 1031 c 2; *Fidelity & Deposit Co. v. Mattingly Lumber Co.*, 176 Md. 217, 220, 4 A. 2d 447 (1939). Further, the appellant made no effort to demonstrate that persons between the ages of 18 and 21 are a "cognizable" group. In cases elsewhere attempts to demonstrate the affinity as a class or group of persons between 18 and 21 years have been made without success. "Every case which has dealt with the problem has concluded that 18-to-21-year-olds do not have a constitutional right to serve on juries." *United States v. Guzman, supra* at 144. The courts in those cases have noted that it is perfectly feasible for the 18-to-21-year-olds to have a constitutional right to express their opinions, attitudes and philosophy in the election process while not possessing a constitutional right to sit in judgment of others.[4]

---

4. United States v. McVean, 436 F. 2d 1120 (5th Cir. 1971);

However, on the limited record before us, we need not, and do not, reach the question of whether 18-to-21-year-olds are a cognizable group who cannot be constitutionally excluded from jury service. In so holding, we do not seek to delay the day when this interesting issue may be squarely met and decided. *Vuitch v. State,* 10 Md. App. 389, 397, 271 A. 2d 371 (1970). However, the best teaching of judicial experience "admonishes us not to entertain constitutional questions in advance of the strictest necessity." *Parker v. County of Los Angeles,* 338 U. S. 327, 333 (1949) ; *Poe v. Ullman,* 367 U. S. 497, 501 (1961) ; *Vuitch v. State, supra* at 397.

## II

## DENIAL OF APPELLANT'S MOTION FOR THE APPOINTMENT OF AN INDEPENDENT PSYCHIATRIST WAS NOT CLEARLY ERRONEOUS

After his plea of not guilty by reason of insanity, the appellant was referred to the Clifton T. Perkins State Hospital for determination of whether he was sane at the time of the alleged offense. Appellant was admitted to Perkins on June 7, 1971 and discharged on June 11, 1971. It was the unanimous opinion of the staff psychiatrists that the appellant did not suffer from any mental disorder at the time of the alleged offense such as to cause him to lack the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. The appellant had been treated at Perkins pursuant to the "Brief Admissions of Evaluation Program." Under this program, defendants from the Third and Seventh Judicial Circuits who raise an insanity defense are sent to Perkins for observation and examination at the hospital for a period of from four

United States v. Tantash, 409 F. 2d 227 (9th Cir. 1969), *cert. denied,* 395 U. S. 968 (1969) ; George v. United States, 196 F. 2d 445 (9th Cir. 1952), *cert. denied,* 344 U. S. 843 (1952) ; United States v. Gargan, 314 F. Supp. 414 (W.D. Wis. 1970).

to five days, as opposed to the usual period of hospitalization of approximately sixty days.

Appellant challenged the reasonableness and adequacy of his examination at Perkins Hospital and moved for the appointment of "an independent medical expert" at the expense of the State. Prior to the hearing on his motion, the motion judge (Loveless, J.) authorized expenses for two psychiatrists. Both psychiatrists questioned whether the Perkins medical staff had made a proper diagnosis and finding with respect to the appellant. They expressed doubts as to whether the appellant's particular mental condition could be properly categorized as a severe anti-social personality disorder. Both believed that the appellant should have been given an electroencephalogram and should have been kept at Perkins for additional observation beyond his four-day stay. Both were of the opinion that the examination which the appellant had received at Perkins was incomplete and inadequate.

The Director of Clifton T. Perkins State Hospital and the Clinical Director testified that the examination which the appellant had received was adequate for the purposes of stating an opinion as to the competency and legal responsibility of the appellant. It was the testimony of both doctors, in substance, that the adequacy of the examination for the purposes of determining legal sanity had not been affected by reducing the length of the patient's stay. Both testified that the electroencephalogram test was no longer routinely used as a diagnostic tool because of its questionable value.

After the hearing on the motion, Judge Loveless filed an opinion and order denying the motion for the appointment of an independent medical expert, ruling that:

> "We have fully reviewed the evidence and evaluated the testimony presented and we believe that the record most amply shows that Mr. Wilkins was afforded a thorough examination as to his state of mind. It seems to us that the opinions expressed by Drs. Maki and Murphy

may be summarized as being differing professional viewpoints or schools of thought from the viewpoints held by the Perkins Medical Staff. We do not believe their testimony casts any shadow of doubt on the thoroughness of the examination given Mr. Wilkins."

On this appeal, the appellant argues that the denial of his motion for permission to retain an independent psychiatrist at the expense of the State violated his right to due process and equal protection of the law. He also contends that the evidence adduced at the hearing on his motion showed that the procedure which was followed in his case at Perkins was inadequate for the making of a proper determination of legal sanity.

In this Court, it is settled that where there has been no challenge of the professional standing and competency of psychiatrists whose examination and report has been furnished at State expense, and no question has been raised as to their competency, impartiality or as to the thoroughness of their examination of the accused, there is no further constitutional obligation on the part of the State to supply defense counsel with funds to hire expert witnesses for the defense for the purpose of offering the opinion that the accused is criminally insane. *Swanson v. State,* 9 Md. App. 594, 267 A. 2d 270 (1970); *Gaither v. State,* 13 Md. App. 245, 249, 282 A. 2d 535 (1971). Here, the appellant challenged the thoroughness of the staff examination and supported his challenge by the testimony of two independent medical experts. After a full hearing on the matter, the motion judge determined that the examination afforded the appellant had been adequate "for the purpose of determining his sanity at the time of the crime and his sanity to stand trial." He took into account the expert testimony offered by the appellant on the motion, but concluded that this testimony did not cast "any shadow of doubt on the thoroughness of the examination given Mr. Wilkins."

We cannot say that the trial judge was clearly erron-

eous in reaching the conclusion he did. Rule 1086. Since the examination which the appellant received at Perkins State Hospital was thorough for the purpose of determining sanity, neither due process nor equal protection of law require that the State furnish him another independent psychiatrist for the purpose of testifying as to his mental condition at the time of the crime. *Swanson v. State, supra* at 602; *McGarty v. O'Brien,* 188 F. 2d 151 (1st Cir. 1951), *cert. denied,* 341 U. S. 928 (1951).

## III

## THE TRIAL COURT PROPERLY PERMITTED AN AMENDMENT OF THE INDICTMENT TO CORRECT A TYPOGRAPHICAL ERROR AS TO THE DATE OF THE OFFENSE

The appellant contends that the trial court erroneously granted the State's motion for permission to amend the indictment for the purpose of alleging that the murder was committed on December 14, 1970 instead of December 14, 1971. The change in the indictment was necessary to correct an obvious typographical error. The grand jury returned its indictment on March 24, 1971. December 14, 1971 was, on its face, an erroneous date.

Whatever the rule in other jurisdictions, it has long been settled in this State that a court may permit an amendment in an indictment with respect to "matters of form, . . . which are not matters of substance, . . . at any time before the commencement of the trial." *Hawthorn v. State,* 56 Md. 530, 535 (1881). The venerable rule of the *Hawthorn* case is now codified in Rule 714 a which expressly vests power in a court to permit the amendment of an indictment or an information "at any time before verdict as to matter of form, but not as to matter of substance." In *Watkins v. State,* 4 Md. App. 47, 50, 240 A. 2d 787 (1968), this Court, referring to Rule 714 a and quoting from the Court of Appeals' deci-

sion in *Corbin v. State*, 237 Md. 486, 489, 206 A. 2d 809 (1965) said:

> "As to what constitutes substance and what is merely formal in an indictment, it may be said that all facts which must be proved to make the act complained of a crime are matters of substance, and that all else—including the order of arrangement and precise words, unless they alone will convey the proper meaning—is formal."

In *Watkins*, we approved of a court permitted amendment changing the date of the crime set forth in the indictment. We permitted the same type of amendment in *Tucker v. State*, 5 Md. App. 32, 245 A. 2d 109 (1968). However, appellant contends that *Watkins* and *Tucker* are distinguishable because those cases involved changes in dates which were not impossible on their face in contrast to the case here. The logic of the distinction escapes us. Actually, a date which on its face appears as an impossible date would seem more strongly to demonstrate that the error was one of form—a technical or typographical mistake. In any event, as in *Watkins* and *Tucker*, the appellant was not prejudiced by the amendment permitted. He knew the offense with which he was charged when he was served with the preliminary complaint, at which time the accurate date was shown. To accept the appellant's argument that the amended indictment should be set aside on the barest of technicalities would manifest that "excessive regard for formalism," *Great Northern Life Insurance Co. v. Read*, 322 U. S. 47, 57 (1944), which can be a bane of the law and a judicially self-imposed obstacle to the achievement of justice.

## IV

### APPELLANT'S POST ARREST STATEMENTS WERE PROPERLY ADMISSIBLE

On February 15, 1971, Detective Rossi obtained a war-

rant for the arrest of the appellant for the murder of Thomas Magellan Lewis. However, later that evening, Rossi was notified that the appellant voluntarily surrendered at the Seat Pleasant Police Station. Rossi went to the station, met with the appellant, advised him of his rights, and asked if he were willing to make a statement without a lawyer present at that time. The appellant responded that he would first like to talk to his mother on the telephone, but that the detective could sit and listen to the conversation. During the telephone conversation with his mother, appellant admitted his involvement in the crime, although he alleged another person performed the robbery and the shooting of Lewis. Then, after Detective Rossi had again advised the appellant of his rights and had obtained the latter's written waiver of those rights, appellant made a handwritten statement in which he implicated himself in the crime, although, once more, he claimed that another person shot the victim. His brother, who had come to the police station, signed the statement as a witness, along with Detective Rossi.

Appellant argues that the implicatory oral and handwritten statements which he gave after he had surrendered at the police station should have been excluded. Appellant's theory here is that his arrest was illegal and that any evidence obtained, including an implicatory statement, "is tainted as the fruit of the poisonous tree." The short answer is that the appellant's arrest was not illegal. After a warrant had been obtained for his arrest, he voluntarily surrendered at the police station before the warrant was served upon him.

However, even assuming, *arguendo*, that the appellant's arrest was illegal, it is established in Maryland that a confession which is otherwise shown to have been voluntary is not rendered inadmissible by the fact that the accused was in custody under an illegal arrest at the time of making the confession. *McDonald v. State*, 10 Md. App. 258, 269 A. 2d 193 (1970) ; *Mulligan v. State*, 10 Md. App. 429, 271 A. 2d 385 (1970). As in *Mc-*

*Donald, supra,* the appellant does not claim that the oral and written statements which he gave to Detective Rossi were obtained in violation of the procedural requirements imposed by *Miranda* or that those statements were not voluntary in the traditional sense. There is no authority for the proposition that a confession or implicatory statement obtained in the wake of an illegal arrest is *per se* to be excluded. The rule of *Wong Sun v. United States,* 371 U. S. 471 (1963) has not been held to control prosecutions in the State courts. *Mefford and Blackburn v. State,* 235 Md. 497, 511, 201 A. 2d 824 (1964), *cert. denied,* 380 U. S. 937 (1964). We have held, and again hold in this case, that a confession or admission is not a "fruit" of an arrest. *McDonald v. State* at 260; *Butina v. State,* 4 Md. App. 312, 326, 242 A. 2d 819 (1968). *See also Morales v. New York,* 396 U. S. 102 (1969), where the Supreme Court declined "to grapple" with the issue.

## V

## ARTICLE XV, SECTION 5 OF THE MARYLAND CONSTITUTION VIOLATES NO RIGHTS GUARANTEED BY THE CONSTITUTION OF THE UNITED STATES

Appellant attacks the constitutionality of Article XV, Section 5 of the Maryland Constitution under which "The Jury shall be the Judge of Law as well as of Fact . . ." He claims that this provision violates the equal protection and due process clauses of the Fourteenth Amendment to the Constitution of the United States. Specifically, he complains that Article XV provides the opportunity for the jury to violate the defendant's right of self-incrimination by ignoring the trial court's instructions that under the law it cannot draw any inference of guilt from the defendant's failure to testify. The contention is unavailing.

The constitutionality of Article XV, Section 5 has been repeatedly upheld by the Court of Appeals and by this Court. *Slansky v. State,* 192 Md. 94, 63 A. 2d 599 (1949);

*Giles v. State,* 229 Md. 370, 183 A. 2d 359 (1962) ; *Avey v. State,* 1 Md. App. 178, 228 A. 2d 614 (1967) ; *Lewis v. State,* 2 Md. App. 678, 237 A. 2d 73 (1968) ; *Avey v. State,* 9 Md. App. 227, 263 A. 2d 609 (1970). Moreover, the Supreme Court of the United States has had occasion to consider Article XV, Section 5, but has failed to intimate doubts about the constitutionality of the provision. In *Giles v. Maryland,* 372 U. S. 767 (1963), the Supreme Court dismissed an appeal which raised this issue, along with others, for want of a substantial federal question. See also *Brady v. Maryland,* 373 U. S. 83 (1963), in which the Court discussed Article XV, Section 5 without questioning its constitutionality.

The whole question was carefully addressed by the Fourth Circuit, speaking through Judge Soboloff, in *Wyley v. Warden,* 372 F. 2d 742, 744 (4th Cir. 1967). In that case, the Fourth Circuit rejected Wyley's challenge to Article XV, Section 5, based upon a claim that the provision denied him due process and equal protection of the law in violation of the Fourteenth Amendment.

In the case at bar, the jury had before it sufficient evidence on the basis of which to convict the appellant. The latter has not attacked the sufficiency of that evidence on his appeal. Further, there is nothing to indicate that the jury did not faithfully follow the view of the law expressed in the trial judge's instructions. And on this record, no suggestion arises that the jury in reaching its verdict ignored the trial judge's instructions and considered the failure of the appellant to testify as evidence of his guilt. Finally, there is nothing to support any speculation that a different verdict would have resulted if the judge could have given binding rather than advisory instructions.

## VI

### THE TRIAL COURT DID NOT ERR IN PERMITTING THE AUTOPSY REPORT TO BE ADMITTED IN EVIDENCE

In his brief, the appellant argues that the trial judge

erred in permitting the autopsy report and attached documents to go to the jury, especially since the report contained clinical information taken from the investigation report of a deputy medical examiner who was available to testify. Article 22, § 8 of the Code provides, in pertinent part, that:

> "The records of the office of the chief medical examiner, and of the several deputy medical examiners, . . . shall be received as competent evidence in any court in this State of the matters and facts therein contained. . . . The records which shall be admissible as evidence under this section shall be records of the results of views and examinations of or autopsies . . . , and shall not include statements made by witnesses or other persons."

While the statute permits the admission of autopsy reports into evidence as official records, it excludes therefrom "statements made by witnesses or other persons." *Rasnick v. State*, 7 Md. App. 564, 256 A. 2d 543 (1969). In *Rasnick*, this Court upheld the conviction in a case where an autopsy report had been admitted which contained information furnished by witnesses and which was therefore not sanctioned under language of the statute. We held that the inadmissible information was merely cumulative of the oral testimony of witnesses and its admission, if error, was harmless. *Id.* at 568. In the instant case, the autopsy report contained a statement that "a citizen reported to the Prince George's County police that there was a man lying on the ground in the parking lot of High's store, Sheriff Road and Nash Street, Prince George's County. He was obviously dead." This statement was merely cumulative of the oral testimony given by the police officer who first examined the victim. Thus, the admission of the statement, even if erroneous, was harmless. *Rasnick v. State, supra.*

## VII

## THE TRIAL COURT'S INSTRUCTIONS WERE PROPER

The appellant objected below, and complains here, about a portion of the trial court's instructions to the jury in which the court said:

> "The Maryland law provides that all murders which shall be perpetrated by any kind of willful, deliberate and premeditated killing shall be murder in the first degree. The law further provides that all other kinds of murder shall be deemed to be murder in the second degree. Upon proof by the State of an unlawful killing without justification or excuse the presumption is that it is murder in the second degree. The State has the burden of proving beyond a reasonable doubt the elements of the crime which would raise the degree to murder in the first degree. The burden rests upon the State in this respect. That is, the State must prove beyond a reasonable doubt that the murder was deliberate, willful and premeditated. The accused, that is, the defendant, on the other hand, has the burden of moving forward with the evidence showing the elements which would reduce the felonious and unlawful killing from second degree to manslaughter, or showing that the killing was justifiable or excusable and that, therefore, the verdict should be not guilty."

Abstracted from and taken out of the entire context of the trial court's charge to the jury, appellant's argument that the above quoted instructions conflicted with the basic presumption of innocence in a criminal case may enjoy a ring of persuasiveness. However, an examination of the entire charge demonstrates that the jury was properly advised as to presumption of innocence and of the obligation which rested on the State to

prove, beyond a reasonable doubt, that a murder had been committed and that the defendant was the perpetrator of the crime.

Once the State has shown beyond a reasonable doubt that a felonious homicide (*i.e.*, murder) has been committed, it is presumed to be murder in the second degree and the burden is upon the accused to show circumstances of alleviation, excuse or justification which would reduce the offense to manslaughter or excuse it entirely. *Abney v. State,* 244 Md. 444, 223 A. 2d 792 (1966), *cert. denied,* 387 U. S. 925 (1967) ; *Lindsay v. State,* 8 Md. App. 100, 258 A. 2d 760 (1969). In Maryland, as in all States of the Union, upon his plea of not guilty "an accused may stand, shielded by the presumption of his innocence, until it appears that he is guilty. . . ." *Davis v. United States,* 160 U. S. 469, 485-86 (1895). The presumption of innocence ceases to exist, however, once the State has proven its case beyond a reasonable doubt. Thus, the presumption of innocence of the crime of second degree murder disappears when the State establishes, beyond a reasonable doubt, that a murder has occurred and that the defendant has committed it.

This Court has never decided the question of the constitutionality of the rebuttable presumption set out in Article 27, Section 411, that: "All other kinds of murder (other than murder in the first degree) shall be deemed murder in the second degree." *Carroll v. State,* 11 Md. App. 412, 421, 274 A. 2d 677 (1971). However, we consistently have held that instructions concerning the presumption of malice in all homicides, when preceded by instructions on the presumption of innocence and of the State's burden of proving guilt beyond a reasonable doubt were not in error. *Johnson v. State,* 4 Md. App. 648, 244 A. 2d 632 (1968) ; *Leyva v. State,* 2 Md. App. 120, 233 A. 2d 498 (1967). We have also decided that the inference of malice which arises upon proof by the State beyond a reasonable doubt that a homicide has been committed, and that the defendant has committed it, does not shift the burden of proof to the accused. Even in

face of the inference, the accused stands innocent until proved guilty beyond a reasonable doubt. The risk of nonpersuasion of the trier of the fact remains with the prosecution. *Lindsay v. State, supra* at 109.

Application of these principles here requires the conclusion that the instructions of the trial court, to which the appellant objected below and which he contests on this appeal, were neither erroneous nor prejudicial. At the outset of his instructions, the trial judge said: "the defendant . . . is presumed innocent of the charge against him and therefore the burden is on the State to prove him guilty beyond a reasonable doubt and, as it is sometimes stated, to a moral certainty." A little later on in the course of his instructions the judge made it clear that "this burden of proof which we have indicated to you *applies to each and every element of the case.*" (emphasis added). Continuing, the trial court admonished the jury that:

> "the State's burden is to prove beyond a reasonable doubt not only that the offense was committed but that the defendant here before you committed it. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him, and if the total circumstances of the identification are not convincing beyond a reasonable doubt you must find the defendant not guilty. You are further instructed that proof of the identity of the alleged deceased and proof that he died because of felonious means must be established by the State beyond a reasonable doubt."

The quoted instruction is a clear admonition to the jury that the State must establish that a felonious homicide, or murder, was committed and that the defendant was the perpetrator of the crime. It was immediately following this portion of his charge that the trial judge instructed the jury on the difference between first and sec-

ond degree murder, the specific instruction challenged by the appellant. In the context of the judge's total charge, it is perfectly clear that when he said: "Upon proof by the State of an unlawful killing without justification or excuse, the presumption is that it is murder in the second degree," he implied clearly that he meant "upon proving beyond a reasonable doubt by the State of an unlawful killing, etc." Once the State has shown that an unlawful killing, without justification or excuse, has occurred, the presumption is, as provided in Article 27, Section 411, that it is murder in the second degree. However, that presumption does not arise until the State has shown beyond a reasonable doubt that a murder has occurred and the defendant committed the crime. In the brief in which he filed in this Court, appellant conceded that the trial court's charge to the jury, "as a whole," makes an effort to convey the view that the burden of proof does not shift to the accused; . . ." [5] That is an accurate assessment of the trial court's instructions, read in their entirety and with no portion thereof taken out of context.

Even if we were to assume that the trial court's instructions concerning the statutory presumption with respect to murder in the second degree fell short of the mark, the deficiency would be harmless. The trial court was explicit in admonishing the jury in order to establish first degree murder "the State must prove beyond a reasonable doubt the murder was deliberate, willful and premeditated." The jury found the appellant guilty of murder in the first degree, thereby vitiating any alleged error in the trial court's instructions with respect to murder in the second degree. *Chapman v. California*, 386 U. S. 18 (1967).

*Judgment affirmed.*

---

5. Appellant's Brief p. 59.