695 A.2d 609

**Connie F. BRIDGES**

v.

**STATE of Maryland.**

**No. 1414, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

June 26, 1997.

114

Martha Weisheit, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Celia Anderson Davis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, and Patricia Jessamy, State's Attorney for Baltimore City, on the brief), Baltimore, for Appellee.

Submitted before MOYLAN and SALMON, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

MOYLAN, Judge.

The core issue on this appeal can most starkly be set out by posing a hypothetical. Hypothesize a jury selection process in which the attorney for a party (whether the trial be criminal or civil is immaterial; whether the party be on one side of the trial table or the other is equally immaterial) has just exercised his tenth and last peremptory challenge. The attorney for the opposing party objects, claiming that the ten peremptory strikes constitute a pattern of invidious discrimination against 39–year–olds. In arguing that a pattern has been demonstrated, he points out that each and every one of the prospective jurors who was peremptorily struck was precisely

39 years of age and that the ten strikes, in combination, eliminated every 39–year–old from the jury pool. The trial judge rules that a pattern has, indeed, been established and requests the attorney who exercised the peremptories to offer some explanation. That attorney responds:

> With all due respect, Your Honor, I am not required to give you an explanation, lest I destroy the peremptory nature of the peremptory challenge. The quality of a challenge as peremptory means not only that I may use it for any purpose I choose, whether you like it or not, but also that I am not required to tell you why I so used it. As a courtesy to the court, however, I will gratuitously volunteer an explanation even though I am not required to give one.
>
> Both my client and I harbor an unabashedly irrational but nonetheless deep-seated detestation of 39–year–olds as a class. Perhaps it is because our ex-spouses were 39 years of age when we divorced them, but that is immaterial. As the word peremptory implies, we need have no reason at all, let alone a good reason, for feeling as we do. We do not for a moment believe that 39–year–olds could not render a fair and impartial verdict. We simply do not like them and will use every peremptory at our disposal at every chance we get to strike them. Our motive, if you must know, is totally mean-spirited.

The issue before us is whether even such a basis for such a use of peremptory challenges would violate any prohibition of either the Constitution of the United States or the Constitution of Maryland.

The appellant, Connie F. Bridges, was convicted by a Baltimore City jury, presided over by Judge Clifton J. Gordy, Jr., of first-degree felony-murder, robbery with a deadly weapon, and conspiracy to commit robbery. On this appeal, she raises the following contentions:

1. That the State unconstitutionally exercised peremptory challenges solely on the basis of age;

2. That the State unconstitutionally exercised peremptory challenges on the basis of race;

3. That Judge Gordy improperly instructed the jury with respect to the conspiracy charge;

4. That Judge Gordy abused his discretion in denying the appellant's motion for a mistrial on the grounds of prosecutorial misconduct; and

5. That the evidence was not legally sufficient to support the verdicts.

### The Objection to the Peremptory Strikes

At one point during the jury selection process, defense counsel challenged the prosecutor's exercise of peremptory strikes by noting that every strike had been against prospective jurors who were Black. The prosecutor, in an effort to demonstrate to the trial court that she was not striking prospective jurors on the basis of race, responded by stating that "I'm striking everyone around age 30 and under, or trying to." The prosecutor explained her rationale for striking jurors of that age by noting that the defendant was approximately 30 years of age. Conceding that the explanation offered by the prosecutor was, if true, race-neutral, defense counsel immediately shifted tactics and argued that the explanation offered by the State was itself constitutionally infirm because age, like race and gender, is a consideration that may not serve as a basis for a peremptory strike.

The trial court found 1) that the explanation offered by the State was race-neutral and 2) that age-based peremptory strikes had never been ruled unconstitutional. Then, by way of justifying what perhaps needed no justification, Judge Gordy went on to observe that because of the respective ages of the victim and the appellant, the State's exercise of peremptory challenges had not been for impermissible reasons.

The appellant argues that both the United States Constitution and the Maryland Declaration of Rights prohibit the State from making peremptory strikes on the basis of age.

### The Maryland Constitutional Issue

Because the doctrinal basis of the Maryland constitutional challenge is totally distinct from that of the federal constitutional challenge, we will examine first the appellant's claim that a peremptory challenge based on age somehow violates the Maryland Constitution. Commendably, the appellant has not urged upon us some illusory Maryland analogue to the Equal Protection Clause of the Fourteenth Amendment, such a constitutional provision never having been formally adopted in this State, or some Maryland equivalent of the academically indefensible *ipse dixit* of *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The appellant, rather, grounds her challenge in that portion of Article 21 of the Maryland Declaration of Rights that guarantees an accused in a criminal prosecution the right to trial "by an impartial jury." The appellant supplements her Article 21 argument by making reference to Md.Code Ann., Cts. & Jud. Proc., §§ 8–102 and 8–103 (1995).

Article 21 guarantees a criminal defendant an *impartial* jury. The character of a jury as impartial is something quite distinct from the character of a jury as representative of a fair cross-section of the population. Dealing strictly with the constitutionally mandated requirement of *impartiality,* the Court of Appeals, speaking through Judge Barnes, defined that quality in *Bristow v. State,* 242 Md. 283, 288–89, 219 A.2d 33 (1966):

Article 21 of the Maryland Declaration of Rights guarantees an accused the right to a trial by an impartial jury. The definition of what constitutes impartial jurors was set out in the early case of *Garlitz v. State,* 71 Md. 293, 300, 18 Atl. 39, 41 (1889):

"The minds of such men always remain open to the correction of former impressions, and remain entirely impartial, with power to hear and determine upon the real facts of the case, without the least bias in favor of former impressions, whatever they may have been. And therefore, in our present state of society, all that can be

required of a juror is that he should be without bias or prejudice for or against the accused, and that his mind is free to hear and impartially consider the evidence, and render a verdict thereon without regard to any former opinion or expression existing in his mind."

This definition was recently reaffirmed and explained in *Grammar [Grammer] v. State*, 203 Md. 200, 211, 100 A.2d 257, 261 (1953). Although the federal constitution does not demand the use of jury trials in state criminal proceedings, where a jury is provided, federal due process requires that it be fair and impartial.

■ Before turning to other flaws in the appellant's argument, it is enough to note that a party claiming that she was denied the right to an impartial jury bears the burden of proving that her jury was, indeed, partial. The appellant in this case has proffered nothing in that regard. With respect to such an allocation of the burden, we stated clearly in *Borman v. State*, 1 Md.App. 276, 279, 229 A.2d 440 (1967):

Bias on the part of prospective jurors will never be presumed, and *the challenging party bears the burden of* presenting facts ... which would give rise to a *showing* of *actual prejudice*. See *Bristow v. State*, 242 Md. 283[, 219 A.2d 33] (1966).

(Emphasis supplied). We spoke to the same effect in *Jones v. State*, 2 Md.App. 429, 431, 234 A.2d 900 (1967):

Conceding the proposition that appellant's right to an impartial jury is guaranteed by both Article 21 of the Maryland Declaration of Rights, *Bristow v. State*, 242 Md. 283, 288[, 219 A.2d 33], and the Fourteenth Amendment to the Federal Constitution, *Beck v. Washington*, 369 U.S. 541[, 82 S.Ct. 955, 8 L.Ed.2d 98]; *Irvin v. Dowd*, 366 U.S. 717[, 81 S.Ct. 1639, 6 L.Ed.2d 751], it is clear that *the burden of proving that the jury was in fact not impartial is on the appellant.*

(Emphasis supplied). *See also Quiles v. State*, 4 Md.App. 354, 357, 243 A.2d 661 (1968); *Couplin v. State*, 37 Md.App. 567,

570–71, 378 A.2d 197 (1977). The appellant has not even made a pretense of shouldering that burden.

■ By way of supplementing her argument based on Article 21 of the Maryland Declaration of Rights, however, the appellant relies in part on Cts. & Jud. Proc. § 8–103, which provides:

> A citizen may not be excluded from service as a grand or petit juror in the courts of the State on account of race, color, religion, sex, national origin, or economic status.

Quite aside from the fact that § 8–103 deals only with the criteria by which names are selected for the entire jury pool and not with the selection, from that pool, of the actual petit jury that will hear a case, the section by its very terms makes no mention of age. It prohibits the exclusion of jurors from the jury pool for 1) race, 2) color, 3) religion, 4) sex, 5) national origin, or 6) economic status. The statute self-evidently does not pertain to age-based exclusion at any stage of the selection process.

■ It is, however, through the further supplementation of Article 21's impartial jury requirement by § 8–102 that the notion emerges that the larger jury pool itself, to be ultimately impartial, must be drawn from a fair cross-section of the population. Section 8–102(a) provides:

> When a litigant in a court of the State is entitled to trial by a petit jury and when a person accused of a criminal offense is presented to a grand jury, the jury shall be selected at random from a fair cross section of the citizens of the State who reside in the county where the court convenes.

In *Wilkins v. State,* 16 Md.App. 587, 300 A.2d 411, *aff'd* 270 Md. 62, 310 A.2d 39 (1973), Judge Scanlan analyzed at length for this Court the collective impact of what are now §§ 8–102 and 8–103.[1] The decision of this Court was not simply affirmed but the Court of Appeals expressly adopted Judge Scanlan's opinion in *Wilkins v. State,* 270 Md. 62, 310 A.2d 39

---

1. At that time §§ 8–102 and 8–103 were codified, respectively, as Ann.Code of Md. (1972 Repl.Vol.) Art. 51, Sections 1 and 2.

(1973). Judge Scanlan pointed out that it was in 1969 (by Ch. 408 of the Acts of 1969) that "Maryland adopted a uniform and comprehensive statute governing the selection of jurors throughout the subdivisions of the State." 16 Md.App. at 591, 300 A.2d 411. He went on to explain that this selection process (and its fair cross-section guarantee) applies to the larger governmental mechanism determining eligibility for jury service generally and establishing the mechanism by which persons are called for jury service. His opinion expressly stated that that mandated selection process had no applicability to the ultimate composition of the actual petit jury selected to try a particular case. He explained, 16 Md.App. at 592–93, 300 A.2d 411:

Article 51, § 1 incorporates the constitutional requirement that a defendant "is entitled to trial by (a) jury ... selected ... from a fair cross section" of the community in which he is being tried. *Smith v. Texas*, 311 U.S. 128, 130[, 61 S.Ct. 164, 165, 85 L.Ed. 84] (1940). *It is not necessary, of course, that the jury actually selected be representative of the community. Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220[, 66 S.Ct. 984, 985–86, 90 L.Ed. 1181] (1946). However, it is a constitutional mandate that "the source of names of prospective jurors and the selection process be reasonably designed to procure a fair cross section." The Supreme Court has summarized the basic constitutional prerequisite to be observed in jury selection:

"The American tradition of trial by jury, ... necessarily contemplates an impartial jury drawn from a cross-section of the community. *Smith v. Texas*, 311 U.S. 128, 130[, 61 S.Ct. 164, 165, 85 L.Ed. 84]; *Glasser v. United States*, 315 U.S. 60, 85[, 62 S.Ct. 457, 471–72, 86 L.Ed. 680]. *This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community;* frequently such complete representation would be impossible. But *it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups.*

*. . . Thiel v. Southern Pacific Co., supra* at 220[, 66 S.Ct. at 985–86]."

(Emphasis supplied).

■ Even on the larger question of official and systematic exclusion from the pool of eligible jurors, however, *age* has never been held to be a prohibited selection criterion. In *Hunt v. State*, 12 Md.App. 286, 278 A.2d 637 (1971), this Court held that Article 51, §§ 1 and 2 (now Cts. & Jud. Proc. Art. §§ 8–102 and 8–103) did not inhibit the State from systematically excluding from jury service all persons under twenty-five years of age. In *Hopkins v. State*, 19 Md.App. 414, 311 A.2d 483 (1973), we held that the same provisions of Maryland law did not prohibit the systematic exclusion from jury service of all persons between eighteen and twenty-one years of age.

■ Even with respect to classifications that unequivocally may not be used to bar jury service generally, Article 21 never applied the bar to the use of peremptory strikes in the *ad hoc* selection of a particular petit jury. Indeed, even if peremptory challenges were deliberately used to exclude Blacks from a particular petit jury, something unquestionably unconstitutional under the Equal Protection Clause of the Fourteenth Amendment as implemented by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), such a practice would still not violate the fair cross-section requirement of either the Federal Sixth Amendment or Article 21 of the Maryland Declaration of Rights as supplemented by §§ 8–102 and 8–103. It would violate something else but not that. In *Lawrence v. State*, 51 Md.App. 575, 584, 444 A.2d 478 (1982), *aff'd* 295 Md. 557, 457 A.2d 1127 (1983), we held:

> Inasmuch as appellant does not contend that the jury pool from which the petit jury was drawn systematically excluded blacks, the use of peremptory challenges to strike blacks from the petit jury was not a violation of Article 21 or 24 of the Maryland Declaration of Rights.

In *Quailes v. State*, 53 Md.App. 35, 37–38, 452 A.2d 190 (1982), we looked to the "impartial jury" requirements of both the Federal Sixth Amendment and of Article 21 of the Mary-

land Declaration of Rights and held that the use of peremptory challenges, no matter how otherwise reprehensible, was simply not regulated by those particular constitutional provisions:

> Nor is the prosecution's use of its peremptory challenges a violation of appellant's sixth amendment right to an impartial jury, notwithstanding the Supreme Court's interpretation of that right in *Taylor v. Louisiana*, 419 U.S. 522[, 95 S.Ct. 692, 42 L.Ed.2d 690] (1975), as requiring that the jury be drawn from a representative cross-section of the community. The Court, in construing the constitutionality of the state's exclusion of women from jury service, emphasized that:
>
>> "[While] holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, but *the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community* and thereby fail to be reasonably representative thereof." (Citations omitted.) *Taylor v. Louisiana*, 419 U.S. at 538[, 95 S.Ct. at 702].
>
> *There is no contention here, however, that the jury pool systematically excluded a distinctive group, specifically blacks, and thus there was no denial of appellant's sixth amendment right to an impartial jury.*
>
> In *Lawrence v. State*, 51 Md.App. at 583[, 444 A.2d 478], this Court flatly held that the use of peremptory challenges to strike blacks from the petit jury was not a violation of Articles 21 or 24 of the Maryland Declaration of Rights.

(Emphasis supplied).

The ultimately dispositive answer to the appellant's claim that the Maryland Constitution was violated is to be found in the Supreme Court decision of *Holland v. Illinois*,

493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), dealing with a federal protection indistinguishable from the Maryland protection. The lists of rights protected by Article 21 of the Maryland Declaration of Rights and the Federal Sixth Amendment are identical. The wording of the two constitutional provisions is virtually *verbatim*. Generally speaking, those entire respective packages of rights should be construed *in pari materia*. Specifically speaking, the *verbatim* guarantees of "trial by an impartial jury" should indisputably be construed *in pari materia*. *Dorsey v. State*, 56 Md.App. 54, 61, 466 A.2d 546 (1983); *Lawrence v. State*, 51 Md.App. 575, 583, 444 A.2d 478 (1982), *aff'd* 295 Md. 557, 457 A.2d 1127 (1983); *Lanasa v. State*, 109 Md. 602, 610, 71 A. 1058 (1909).

The *Holland v. Illinois* case came right in the middle of the explosion of Fourteenth Amendment law triggered by *Batson v. Kentucky*. Significantly, however, Holland chose, unwisely it turned out, to predicate his attack on the State's use of peremptory challenges against Black prospective jurors exclusively on the Sixth Amendment guarantee of an impartial jury rather than on the Fourteenth Amendment guarantee of equal protection. Under a fact scenario that indisputably represented a patent violation of *Batson* and the Fourteenth Amendment had such a challenge been raised, the Supreme Court nonetheless affirmed the conviction, holding that the Sixth Amendment simply did not apply to the use of peremptories. One year later, in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), in a fact situation indistinguishable from that in *Holland v. Illinois*, Powers did prevail by invoking the Fourteenth Amendment, whereas Holland had failed by invoking the Sixth Amendment.

In *Holland v. Illinois*, the Supreme Court held squarely that the Sixth Amendment's guarantee of an impartial jury is simply not implicated by the use of peremptory challenges:

> We reject petitioner's fundamental thesis that a prosecutor's use of peremptory challenges to eliminate a distinctive group in the community deprives the defendant of a Sixth Amendment right to the "fair possibility" of a representative jury.

. . .

A prohibition upon the exclusion of cognizable groups through peremptory challenges has no conceivable basis in the text of the Sixth Amendment, is without support in our prior decisions, and would undermine rather than further the constitutional guarantee of an impartial jury.

493 U.S. at 478, 110 S.Ct. at 806. Justice Scalia, writing for the Court, explained that historically the unfettered right to use peremptory challenges in a truly peremptory way had never been deemed incompatible with the right to an impartial jury:

But to say that the Sixth Amendment deprives the State of the ability to "stack the deck" in its favor is not to say that each side may not, once a fair hand is dealt, use peremptory challenges to eliminate prospective jurors belonging to groups it believes would unduly favor the other side. Any theory of the Sixth Amendment leading to that result is implausible. The tradition of peremptory challenges for both the prosecution and the accused was already venerable at the time of Blackstone, see 4 W. Blackstone, Commentaries 346–348 (1769), was reflected in a federal statute enacted by the same Congress that proposed the Bill of Rights, see Act of Apr. 30, 1790, ch 9, § 30, 1 Stat 119, was recognized in an opinion by Justice Story to be part of the common law of the United States and has endured through two centuries in all the States. The constitutional phrase "impartial jury" must surely take its content from this unbroken tradition.

493 U.S. at 481, 110 S.Ct. at 808 (Citations and footnote omitted).

The opinion also quoted with approval *Lockhart v. McCree*, 476 U.S. 162, 173, 106 S.Ct. 1758, 1764–65, 90 L.Ed.2d 137 (1986):

"We have never invoked the fair-cross-section principle to invalidate use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed

to jury panels or venires, to reflect the composition of the community at large."

493 U.S. at 482–83, 110 S.Ct. at 808.

The Maryland constitutional challenge to the State's use of peremptories based on age is a non-starter. Article 21 of the Declaration of Rights (and its Sixth Amendment analogue) are simply inapplicable to the entire phenomenon of peremptory challenging. The appellant has not crossed the necessary threshold and the merits of how or why the State employed its peremptory challenges are not before us. The weapons chosen by the appellant to mount the Maryland constitutional attack fall short of the entire target area.

### *The Federal Constitutional Issue*

The appellant's federal constitutional challenge to the State's peremptories based on age invokes, by dramatic contrast, the Equal Protection Clause of the Fourteenth Amendment. That provision most definitely applies to the phenomenon of peremptory challenging, as illustrated by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and its burgeoning progeny. The threshold of applicability has thus been crossed and the details of how and why peremptories were used are at least up for further consideration. Although the weapon chosen for this attack does not necessarily hit the particular target of age-based strikes, it most definitely carries to the general target area and closer analysis is, therefore, called for.

In turning the glare of the Constitution on the use of peremptory strikes, *Batson v. Kentucky*'s most significant subdecision was its deliberate choice of the Equal Protection Clause as its standard. In both the lower courts and before the Supreme Court, Batson himself had argued only on the basis of the Sixth Amendment and had eschewed any reliance on the Fourteenth Amendment. The Supreme Court, to the surprise of almost everyone, ignored totally the Sixth Amendment's right to an impartial jury and decided *Batson* exclusively on the basis of the Equal Protection Clause.

It was that strategic decision to use the Fourteenth Amendment as its doctrinal fulcrum that made possible the incredible surge in *Batson*-based jurisprudence. The Sixth Amendment, by its very terms, applies only to "criminal prosecutions." Under it, the strictures of *Batson* could never, for instance, have been applied to civil cases. The Fourteenth Amendment, by contrast, has no such limitation on its applicability and *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), was able to apply the *Batson* strictures to civil cases.

The Sixth Amendment, also by its very terms, is a package of rights only for the benefit of "the accused." Under it, the strictures of *Batson* could never, for instance, have been applied to the use of peremptories by criminal defense counsel. The Fourteenth Amendment, by contrast, has no such limitation on its beneficiaries and *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), was able to impose the *Batson* strictures to peremptory challenges exercised by a criminal defendant.

The utilization of the Equal Protection Clause has, however, posed some almost imponderable questions for the *Batson* jurisprudence. There is, on the one hand, a growing body of *Batson*-based cases. There is, on the other hand, a massive body of equal protection law that has been developing since 1868. For eight years after *Batson* was decided, the Supreme Court provided little, if any, guidance as to how those two bodies of law would ultimately mesh. How, for instance, could one apply to the *ad hoc* and idiosyncratic decision to strike a juror in a single case a body of principles developed to examine broad legislative decisions of sweeping applicability? There is just not a good fit between the peremptory challenge problem and the Equal Protection Clause solution.

If an attorney exercised a peremptory challenge based on the prospective juror's inclusion in some "suspect" classification such as one based on race, national origin, or state of alienage, the attorney, if called upon, could never satisfy the "strict scrutiny" test by showing some "compelling" or "over-

riding" governmental need for what was only his idiosyncratic hunch or, at best, his sense of trial tactics. If there were conceivably some compelling or overriding need for a strike, that need presumably would have been served by a challenge for cause. If an attorney exercised a peremptory challenge based on the prospective juror's gender or legitimacy of birth, the attorney, if called upon, could never satisfy the "heightened scrutiny" test by showing that his hunch or his trial tactics were "substantially related" to an "important governmental objective." If there were conceivably some important governmental objective that could justify a strike, that objective presumably would have been served by a challenge for cause.

In trying, awkwardly at best, to apply equal protection law in the totally foreign environment of a trial advocate's effort to get an "edge" on the opposition in the jury selection process, the courts would seem to have no choice but to truncate the normal equal protection analysis and to announce, for the lack of any viable alternative modality, that peremptory challenges based on classifications that would be subject to either strict scrutiny or heightened scrutiny are *ipso facto* violative of *Batson v. Kentucky.* By some slow and painful process, this seems to be what is happening.

There is also the very basic problem of what classifications are to be deemed forbidden. *Batson v. Kentucky* is only eleven years old and has not, in terms of the classes of persons to which it applies, necessarily reached its full potential. The overwhelming likelihood is that it has not. The initial application, in the *Batson* case itself, was to peremptory strikes exercised against Black prospective jurors. It was immediately clear, however, that the coverage had to be broader than that and would extend to a peremptory based on the prospective juror's race, regardless of what that race might be. What is now demanded is that the reason for a peremptory, when a reason must be given, be race-neutral. *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). In Maryland, we have routinely been applying the *Batson* strictures to racially-motivated peremptories exercised against Whites as

surely as we have applied them to those exercised against Blacks. *Gilchrist v. State,* 97 Md.App. 55, 627 A.2d 44 (1993), *aff'd* 340 Md. 606, 667 A.2d 876 (1995). *Cf. Ball v. Martin,* 108 Md.App. 435, 672 A.2d 143 (1996).

The coverage of *Batson* was arguably significantly expanded by *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), but, strangely, that apparent expansion of coverage was *sub silentio* without a murmur of express acknowledgment. The case dealt with peremptories exercised against "Hispanics" or "Latinos." Because the terms presumably apply to Spanish-speaking, Spanish-surnamed individuals who are Black *or* White *or* American Indian, the classification covered in that particular case would seem to have been something other than merely racial. *See Mejia v. State,* 328 Md. 522, 616 A.2d 356 (1992). Courts do have a mysterious penchant for leaving things deliberately vague.

A major expansion of coverage was expressly effected by *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). The *Batson* strictures were there applied to gender-based peremptory challenges exercised against males. Although only by way of *dicta,* to be sure, the language of the opinion strongly suggested that *Batson* would apply to gender-based peremptories exercised against females as well. The strong implication of *J.E.B. v. Alabama,* moreover, was that if both genders are covered, then, by parity of reasoning, all races are similarly covered.

At the higher echelons then of Equal Protection Clause scrutiny, what remains to be decided is whether *Batson* will cover peremptory challenges based on a prospective juror's 1) national origin, 2) state of alienage, or 3) legitimacy of birth. In other Equal Protection Clause contexts, those classifications are covered. Since it is the Equal Protection Clause that is being applied in the *Batson* jurisprudence generally, it is difficult to conceive of a limiting principle that would not extend the coverage to such classifications. The law is not always logical, however, and the resolution of this question is still hidden in future mists.

The *Batson* jurisprudence has been largely neglectful of possible coverage at the lowest echelon of Equal Protection Clause scrutiny. Would the strictures of *Batson*, for instance, apply to peremptories based on a prospective juror's membership, as in the case before us, in a classification based on age? It is highly questionable whether an attorney's instinctive hunch or Machiavellian trial tactics could satisfy even the more relaxed scrutiny of the "rational basis" test, if he were called upon to justify every peremptory based on a prospective juror's membership in some conceivable class or group.

The nagging difficulty was that for eight years after *Batson* the Supreme Court did not articulate its reasoning in the *Batson* cases in generic Equal Protection Clause language. Fortunately, a shaft of bright light at long last emanated from Justice Blackmun's opinion for the Court in *J.E.B. v. Alabama:*

> Our conclusion that litigants may not strike potential jurors solely on the basis of gender does not imply the elimination of all peremptory challenges. . . . Parties still may remove jurors whom they feel might be less acceptable than others on the panel; gender simply may not serve as a proxy for bias. *Parties may also exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to "rational basis" review.*

511 U.S. at 143, 114 S.Ct. at 1429.(emphasis supplied).

That long-awaited insight is the major premise of our syllogism. All that remains in pursuit of our conclusion is to fill in the minor premise. Is a classification on the basis of age one that is subject only to the "rational basis" test or one, on the other hand, that is subject to "strict" or "heightened" scrutiny?" Justice Blackmun cited two cases after making the above statement, one of which is *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Although that case concerned a classification based on mental retardation, the Supreme Court in its discussion of the level of scrutiny applied to various classifications for purposes of the Equal Protection Clause stated:

*We have declined, however, to extend heightened review to differential treatment based on age:*

> "While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated on the basis of race or national origin, have not experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562[, 2567], 49 L.Ed.2d 520 (1976).

> The lesson of *Murgia* is that where individuals in the group affected by law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end.

(Emphasis supplied). *Cleburne,* 473 U.S. at 441–42, 105 S.Ct. at 3255. *See also Gregory v. Ashcroft,* 501 U.S. 452, 470–71, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991)("This Court has said repeatedly that age is not a suspect classification under the Equal Protection Clause."); *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979).

The syllogism is now complete:

*Batson* does not cover "rational basis" classifications.

An age classification is a "rational basis" classification.

Therefore, *Batson* does not cover an age classification.

Accordingly, the State's peremptory challenges in this case based on the ages of the prospective jurors were truly peremptory and needed no justification. *Batson* does not apply to age-based peremptories.

### *The Peremptories Were Racially Neutral*

■ The appellant's second contention is that Judge Gordy committed error in finding that the State's peremptories were racially-neutral. It is now thoroughly settled that the standard of appellate review for rulings of this nature on the part of a trial judge is the highly deferential clearly erroneous standard. *Hernandez v. New York,* 500 U.S. 352, 360–65, 111 S.Ct. 1859, 1866–69, 114 L.Ed.2d 395 (1991); *Purkett v. Elem,* 514 U.S. 765, 767–69, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834, 839 (1995); *Ball v. Martin,* 108 Md.App. 435, 450–55, 672 A.2d 143 (1996). Indeed, in *Bailey v. State,* 84 Md.App. 323, 328–29, 579 A.2d 774 (1990), we explained why the "clearly erroneous" standard of appellate review is particularly appropriate for trial rulings of this sort:

> It is the trial judge who is in close touch with the racial mood, be it harmonious or be it tense, of the local community, either as a general proposition or with respect to a given trial of high local interest. The trial judge is positioned to observe the racial composition of the venire panel as a whole, a vital fact frequently not committed to the record and, therefore, unknowable to the reviewing court. The trial judge is able to get the "feel" of the opposing advocates—to watch their demeanor, to hear their intonations, and to spot their frequently unspoken purposes. It is a total process in which nonverbal communication may often be far more revealing than the formal words on the typewritten page. The standard of review, therefore, is perforce that of whether the trial judge's fact finding as to this threshold showing is clearly erroneous.

With respect to the standard of appellate review, the Supreme Court was emphatic in *Hernandez v. New York:*

> The trial judge in this case chose to believe the prosecutor's race-neutral explanation for striking the two jurors in question, rejecting petitioner's assertion that the reasons were pretextual. In *Batson,* we explained that *the trial court's decision on the ultimate question of discriminatory*

*intent represents a finding of fact of the sort accorded great deference on appeal:*

"... Since the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, *a reviewing court ordinarily should give those findings great deference.*"

*Batson's treatment of intent to discriminate as a pure issue of fact, subject to review under a deferential standard,* accords with our treatment of that issue in other equal protection cases.

500 U.S. at 364, 111 S.Ct. at 1868–69. (Citations omitted; emphasis supplied).

 Under the clearly erroneous standard of review, the only question is whether there was *any* legally sufficient basis for Judge Gordy's finding that the peremptories were not racially motivated. The prosecuting attorney said that her peremptories were based not on the race of the jurors but on their ages. *Ipso facto,* that is a legally sufficient basis to support Judge Gordy's finding in that regard. The ruling was, therefore, not clearly erroneous.

### The Conspiracy Instruction

 One of the charges of which the appellant was convicted was conspiracy to commit robbery. Judge Gordy instructed the jury on the meaning of conspiracy. In explaining that one conspirator could be held responsible for the acts of another conspirator taken in furtherance of the conspiracy, he advised:

The idea is that every individual directs his activity toward accomplishing the criminal objective. And the conspirator is responsible for the natural and probable consequences of the acts committed by a fellow conspirator. *Even for homicide, out of one of the conspirator's presence, even if homicide was never contemplated by one of the conspirators originally where the acts are done in pursuance of a common design.* (emphasis supplied).

Although that seems on the surface like a perfectly accurate statement of the law and we see no obvious fault with it, it is unnecessary for us even to consider its propriety. When the appellant objected at trial, she based her objection on the proposition that a conspiracy instruction could not, as an illustration of conspiracy law, make mention of murder if the State had failed to indict the defendant for conspiracy to murder. Without suggesting for a moment any merit to that argument, it is not the argument that the appellant now makes before us on appeal. She now argues that the instruction erroneously imposed on the appellant some form of "strict liability." The short answer to that contention is that no objection was made to Judge Gordy in that regard and nothing in that regard has, therefore, been preserved for appellate review. What the appellant did preserve for appellate review is not now argued; what is now argued was not preserved for appellate review.

### The Denial of the Motion for a Mistrial

The appellant also complains that Judge Gordy erroneously denied her motion for a mistrial after an ostensible violation by the State of the mandatory discovery rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). What was involved was a snippet of conversation by the appellant in the presence of two witnesses that occurred immediately after the appellant concluded a telephone conversation shortly after the occurrence of the crime. A witness for the State gave his version of that conversation. The other witness was not called to testify. On the cross-examination of a police officer, however, it was brought out that the other witness gave a version of that brief conversation that did not actually contradict the witness's version but was significantly less inclusive and less damaging. On that basis, the appellant moved for a mistrial.

Judge Gordy found, in the first instance, that the second version of the conversation was not *per se* exculpatory and did not, therefore, engage the gears of *Brady v. Maryland*. We fully agree. He pointed out that it, at most, might

have given the defense some ground for cross-examining the first witness and arguably impeaching the first witness's version of the conversation. Evidence of that sort, however, albeit helpful, is simply not *Brady* material.

▮ Even if one were to assume, purely for the sake of argument, that a *Brady* violation had occurred, a mistrial is still not necessarily the appropriate sanction. In this case, the jury had, through the testimony of the officer, the benefit of the alternative version of the conversation. Judge Gordy offered, moreover, to have the second potential witness brought in, but the appellant declined to take advantage of that opportunity. A mistrial is an extreme sanction, something to be used only in cases of imperative necessity. The decision as to whether it is necessary, moreover, is one entrusted to the sound discretion of the trial judge. *Burks v. State*, 96 Md.App. 173, 188–90, 624 A.2d 1257 (1993). In this case, we see no remote abuse of that discretion on the part of Judge Gordy.

### The Sufficiency of the Evidence

▮ The appellant's final contention is that the evidence was not legally sufficient to support her convictions. The evidence, to be sure, was in part circumstantial. It was also, however, extensive.

On March 11, 1994, a series of tragic events played out on the streets of Baltimore—events involving fraud, drugs, murder, and concealment of that murder. The victim was Harry Brown. Mr. Brown, for what appears to have been a significant length of time, had had a personal relationship with the appellant. Mr. Brown, referred to by others as the appellant's "Sugar Daddy," provided financial support for the appellant, even purchasing from the appellant food stamp credits that she received through an Independence card account. In the six months prior to March 11th, however, Mr. Brown and the appellant had begun seeing each other less frequently. Indeed, it appears that Mr. Brown was no longer financially able to bestow money on the appellant as he once had done.

On March 11, 1994, the day of the murder, the appellant called Mr. Brown's residence between three and five times in an effort to speak with him. The appellant was apparently calling because Mr. Brown was supposed to buy food stamp credits either from the appellant or from someone the appellant knew, and the appellant appeared eager for Mr. Brown to come to her house as soon as possible. Eventually, Mr. Brown got the messages and left home at around 5:30 p.m. to meet the appellant. About fifteen minutes after Mr. Brown left, the appellant called the home once again, but that time she was told that Mr. Brown had left and was on his way.

Although the appellant claimed, during subsequent interviews with the police, to have had food stamp credits on her Independence card account at that time, she actually had not. In fact, at 3:17 p.m. on March 11, the balance of money remaining on the appellant's Independence card had been withdrawn, reducing the credit balance to zero. The next activity recorded on the Independence card was at 6:28 p.m. that day, when the holder of the card checked the balance on the card at a Giant food store near the appellant's residence.

Later that evening, two individuals, while walking along Wicomico Street, discovered nine dollars in cash and various personal belongings that were covered with blood. The Police Department was contacted, and several uniformed officers, homicide detectives, and crime lab technicians arrived at the scene at about 7:40 p.m. to examine the blood-covered items. The items included Mr. Brown's driver's license and credit cards, and a broken pair of eyeglasses that matched those worn by him in his driver's license photograph. Moreover, the detectives found at the scene both an identification card and an Independence card in the appellant's name, and a birth certificate for Donald McNeil, Jr. Detectives immediately attempted to contact Mr. Brown, the appellant, and Donald McNeil because they suspected, based on the amount of blood at the scene, that someone had been grievously injured.

The detectives proceeded to the appellant's address, which was less than a mile from the crime scene, but found no one at

home and no evidence of a crime. While the detectives were examining her apartment, the telephone rang and one of the detectives answered the phone. The individual making the call identified herself as "Connie" and then asked about her son. At the request of the detectives, she agreed to come to the apartment in order to talk to the detectives. She never arrived. The detectives, however, traced the call and found that it had been placed at 733 West Saratoga Street. Proceeding to that location, they there learned from witnesses that the appellant and a man named Donald McNeil had been there but had left approximately an hour before the detectives arrived.

Wardell Ellen, who resided at 733 West Saratoga Street, informed the detectives that the appellant had a boyfriend named Donald McNeil. Mr. Ellen also informed them that the appellant and Mr. McNeil had a child together. Mr. Ellen told the detectives that the appellant and McNeil had entered his residence with two bags of heroin and then, at approximately 10:00 p.m., the appellant had used the telephone. During that conversation, the appellant had stated "Who is this? What you doing at my house?" After the conversation, the appellant called to McNeil, "Come on, we got to move that motherfucker." The appellant and McNeil then left in a "black" colored car with a license plate that had as the first number a five and as the last number a six.

After receiving that information from Mr. Ellen, the detectives contacted Mr. Brown's family and learned that Mr. Brown owned a burgundy colored 1990 Chrysler New Yorker with the license tag of WLS–569. Moreover, Ms. Brown informed the detectives that the appellant had called the Brown home at around 10:30 p.m. and had stated 1) that she had seen Mr. Brown, 2) that McNeil wanted to talk to Mr. Brown, and 3) that Mr. Brown had left the appellant's residence at 7:00 p.m. Ms. Brown also testified that at 9:00 a.m. the following day, the appellant had called Ms. Brown stating that she was sorry and that she didn't know "what the 'F'" happened." At that time, Mr. Brown's body had not been

found and it was not generally known that he had been murdered or even hurt.

It was not until March 14, 1994, that Mr. Brown's body was ultimately found in the trunk of his own car. He had been repeatedly stabbed, with the fatal blow being a stab wound to the right side of his face that severed the temporal artery. Based on the spray of blood above the body on the inside of the trunk, as well as blood that had been discovered on Wicomico Street, investigators concluded that Mr. Brown had been alive at the time he was placed in the trunk. The medical examiner concluded that the victim could have lived from 30 minutes to an hour after sustaining the injuries. On examining the body, investigators also observed that Mr. Brown's clothing was disheveled and that a ring had been removed from Mr. Brown's finger after blood had coagulated on it. Latent prints were recovered from the trunk lid and were found to match the prints of McNeil.

Ultimately, detectives located both the appellant and McNeil, with their son, in North Carolina, and warrants were issued for their arrest. On March 18, 1994, however, the appellant appeared at the Central District police station in order to turn herself in to authorities. Thereafter, the appellant gave a statement to Detective Sergeant Gary Childs. In her statement, which was admitted into evidence, the appellant admitted she was with Mr. Brown and McNeil at about 7:00 p.m. on March 11th, but she claimed that the two men left her residence together. The appellant stated that McNeil returned 30 minutes later and stated that he had gotten into a fight with Mr. Brown and that Mr. Brown had pulled a knife on him. The appellant admitted to using Mr. Brown's car, purchasing drugs, and going to 733 West Saratoga Street. Contrary to what Mr. Ellen had claimed, the appellant denied leaving 733 West Saratoga with McNeil. The appellant claimed, rather, that she had gotten a ride with someone else.

The day that McNeil was arrested, two cuts were observed on his hands and were photographed. The medical examiner testified that those wounds were less than two weeks old at

the time they were photographed and that he was unable to determine whether the wounds were caused by one or more than one object.

That evidence was legally sufficient to permit the jury to conclude that the appellant took part with McNeil in bringing about the death of Mr. Brown. The jury could have found that the appellant no longer saw any continuing advantage in having Mr. Brown as her "Sugar Daddy" because he was running out of available funds. In a final effort to extract money from Mr. Brown, the appellant lured him to her home by placing numerous telephone calls under the pretense that she wished him to purchase food stamp credits from her Independence card. That deceptive purpose could have been found by the jury from the fact that the appellant had withdrawn all remaining credit on the card only hours before Mr. Brown was set to arrive. The appellant, therefore, had no intention of actually giving Mr. Brown the food credits. The jury could have reasonably concluded that the appellant's role in the conspiracy was to lure Mr. Brown to the location where Mr. McNeil could then rob him.

There was also evidence from which the jury could have found that after Mr. Brown was originally stabbed, he was placed in the trunk of his own car by McNeil while he was still alive. McNeil, after completing the planned robbery, drove back to the appellant's residence and picked her up. At that point, having learned that McNeil had stabbed Mr. Brown during the course of the robbery, the appellant and McNeil tried to decide where they would dump Mr. Brown's body. After calling her residence from the Saratoga dwelling, the appellant, to her shock, found out that detectives were already investigating the crime and panicked. In an effort to secure additional time to dispose of the body, the appellant assured the detectives that she would return to her residence despite the fact that she had no such intention.

The concert of action is even more apparent from the fact that after ending her conversation with the detectives, the appellant called to McNeil, "Come on, we got to move that

motherfucker." That statement provided a basis from which the jury could have concluded that the appellant was not only fully cognizant of what had transpired that evening, but was an active participant in bringing such events about. The jury could reasonably have found that that statement was not one that would have been made by one who was shocked or surprised by the murder of a long-time friend.

The jury could even have concluded that Mr. Brown was still alive and might have been saved by prompt medical attention at a time when the appellant and McNeil callously left him dying in the trunk as they drove around in his car and used the money stolen from him to buy drugs. After finishing the phone call with the detectives, the appellant and McNeil again left in Mr. Brown's car, with Mr. Brown (alive or dead) still in the trunk, in order to find a location to abandon the car. Significantly, prior to the body's being found three days later, the appellant acknowledged some awareness of what had happened by telling Ms. Brown that she was sorry and that she didn't know "what the 'F' happened." Ultimately, the appellant and McNeil fled the area for North Carolina, flight being evidence of consciousness of guilt.

Based on the evidence introduced at trial, we have no difficulty holding that it was sufficient to support the appellant's convictions.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**